J-S73023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ERIC J. HALL, | |
| Appellant | No. 595 WDA 2018 |

Appeal from the PCRA Order Entered March 23, 2018
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000006-2012

BEFORE:  GANTMAN,  P.J.,  BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED JANUARY 30, 2019**

Appellant, Eric J. Hall, appeals from the post-conviction court's March 23, 2018 order denying his timely petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  After careful review, we affirm.

Rather than reiterating the facts of Appellant's underlying convictions, we rely on the detailed summary set forth by the PCRA court in its February 9, 2017 opinion.  *See* PCRA Court Opinion (PCO), 2/9/17, at 2-11.  On September 18, 2013, a jury convicted Appellant of two counts of first-degree murder and related offenses.  On December 17, 2013, he was sentenced to two, consecutive life terms of incarceration, without the possibility of parole. He filed a timely direct appeal and, after this Court affirmed his judgment of sentence, our Supreme Court denied his subsequent petition for allowance of appeal.  ***Commonwealth  v.  Hall***, No. 131  WDA  2014,  unpublished

memorandum (Pa. Super. Dec. 16, 2014), *appeal denied*, 116 A.3d 603 (Pa. 2015).

Appellant filed a timely, *pro se* PCRA petition and counsel was appointed. An amended petition was filed by counsel on June 30, 2016, and the court conducted an evidentiary hearing on November 15, 2016. There, Appellant abandoned all but one claim of trial counsel's ineffectiveness, involving counsel's failure to call Appellant's mother to the stand at trial. On February 9, 2017, the PCRA court issued an opinion that notified Appellant of its intent to deny this ineffectiveness claim. In response, Appellant filed a *pro se* motion to amend his petition and dismiss his PCRA counsel. The PCRA court granted Appellant's motion to amend, and withdrew the representation of his court-appointed PCRA counsel.

Thereafter, Appellant retained private counsel, who filed an amended petition on his behalf on December 1, 2017, raising a second claim of trial counsel's ineffectiveness, arguing that counsel erred by not requesting a certain jury instruction in response to a question posed by the jury. On March 23, 2018, the court issued an order explaining that it was dismissing that claim without a hearing, and also formally dismissing the other claims raised in Appellant's first amended petition, on which a hearing had been held.[1]

_____

[1] The PCRA court did not issue a Pa.R.Crim.P. 907 notice of its intent to dismiss, without a hearing, the ineffectiveness claim raised in Appellant's second amended petition. However, because Appellant does not object to that omission on appeal, he has waived it for our review. **See Commonwealth v. Taylor**, 65 A.3d 462, 468 (Pa. Super. 2013) ("The failure to challenge the absence of a Rule 907 notice constitutes waiver.") (citation omitted).

Appellant filed a timely notice of appeal, and he also timely complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. In lieu of a Rule 1925(a) opinion, the PCRA court issued a statement indicating that it was relying on the rationale set forth in its February 9, 2017 opinion and March 23, 2018 order.

Herein, Appellant raises two issues for our review:

I. Whether trial counsel was ineffective for failing to call Appellant's mother, Deborah Finley, who would have testified that she did not give her son the handgun discussed during the trial as the possible murder weapon until two days after the murders?

II. Whether trial counsel was ineffective for failing to request the alternative hypothesis instruction where the Commonwealth's case was based solely on circumstantial evidence?

Appellant's Brief at 1.

We have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have reviewed the thorough and well-crafted decisions of the Honorable Rita Donovan Hathaway, President Judge of the Court of Common Pleas of Westmoreland County. We conclude that President Judge Hathaway's extensive, well-reasoned opinion issued on February 9, 2017, accurately disposes of the first issue presented by Appellant. *See* PCO at 12-21. Additionally, President Judge Hathaway's March 23, 2018 order offers a legally sound explanation for rejecting the second claim Appellant raises herein. *See* PCRA Court Order, 3/23/18, at 1-6. Accordingly, we adopt

those decisions as our own and affirm the order denying Appellant's petition for the reasons set forth therein.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2019

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
                                            )
             VS.                    )
                                            )    No.   6 C 2012
ERIC J. HALL,                      )
                                            )
                    Defendant.  )

## ORDER OF COURT

**AND NOW,** this _23_ day of March, 2018, upon consideration of Defendant's

response to the Court's Notice of Intent to Dismiss, and for the reasons already set forth

in this Court's Order of Court and Notice of Intent to Dismiss, attached hereto,

Defendant's petition for post-conviction relief is hereby **DISMISSED.**

This Court issued a Notice of Intent to Dismiss Defendant's petition for post-

conviction relief on February 9, 2017, after an evidentiary hearing. Defendant filed a

motion to amend his petition on March 7, 2017. The Court granted Defendant's motion,

withdrawing court-appointed Attorney Timothy Andrews' appearance in the case. Private

counsel Chris Eyster entered his appearance on or about the same date. Defendant filed

an amended petition on December 1, 2017, in which he averred that trial counsel was

ineffective for failing to request a specific jury instruction during trial.

Defendant's claim is in reference to a question submitted by the jury to the Court

during deliberations. The question was as follows:

> Can we say guilty if our common sense says guilty, but the
> State's case doesn't tie up all loose ends and leaves some
> doubt?

1

(TT 1329).

In response to the question, the Court reiterated the following standards regarding presumption of innocence and reasonable doubt:

> Ladies and gentlemen, I'm going to read again for you the definition of presumption of innocence and burden of proof and reasonable doubt, and I'm sure that will clarify the answer for you.
>
> A fundamental principle of our system of criminal law is that the defendant is presumed to be innocent. The mere fact that he was arrested and is accused of a crime is not evidence against him. Furthermore, the defendant is presumed innocent throughout the trial and unless and until you conclude, based on careful and impartial consideration of the evidence, that the Commonwealth has proved him guilty beyond a reasonable doubt.
>
> It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged and the defendant is guilty of that crime beyond a reasonable doubt. The person accused of a crime is not required to present evidence or prove anything in his own defense. If the Commonwealth's evidence fails to meet its burden, then the verdict must be not guilty. On the other hand, if the Commonwealth's evidence does prove beyond a reasonable doubt that the defendant is guilty, then your verdict should be guilty.
>
> Although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime. A

2

reasonable doubt must be a real doubt. It may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

So, to summarize, you may not find the [defendant] guilty based on a mere suspicion of guilt. The Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt. If it meets that burden, then the defendant is no longer presumed innocent and you should find him guilty. On the other hand, if the Commonwealth does not meet its burden, you must find him not guilty.
(TT 1329-31).

Defendant, in his amended petition, states that the jurors' question "should have prompted trial counsel to request" the following instruction:

Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the Commonwealth has proved each fact essential to that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.

Defendant further states that when the jury asked the aforementioned question, the Court had a *sua sponte* duty under the due process clause of the U.S. and Pennsylvania Constitutions to instruct the jury on how to evaluate circumstantial evidence when the prosecution "substantially relied on circumstantial evidence to establish any element of its case." In support of this contention, Defendant cites two California Supreme Court cases, which relied on standard California criminal jury instructions, and one Connecticut

3

Supreme Court case, which also relied on relevant State-specific criminal jury instructions. Defendant did not list any case law from this Commonwealth to support his claim.

In order to successfully raise a claim of ineffective assistance of counsel in a petition for post-conviction relief, a defendant must plead and prove, by a preponderance of the evidence:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.
> *Comm. v. Reed,* 971 A.2d 1216, 1221 (Pa. 2009) (citing *Comm. v. Pierce,* 527 A.2d 973, 975 (Pa. 1987)).

As a threshold matter, there is no arguable merit to Defendant's claim. The Court notes that the jurors' question made no reference to circumstantial evidence, and addressed only "some doubt" they had while deliberating. Moreover, Defendant's contention ignores the "unquestionable maxim of law . . . that a trial court had broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Comm. v. Antidormi,* 84 A.3d 736 (Pa.Super. 2014). Defendant does not in any way aver that the Court's instruction was inaccurate or improper.

Finally, the Court could not find any support in Pennsylvania jurisprudence for Defendant's proposed jury instruction. Again, it appears that Defendant is relying on a

4

standard jury instruction from California. Specifically, Standard California Criminal Jury Instruction 224 reads as follows:

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.
>
> Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of the reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.[1]

There is no arguable merit to the claim that defense counsel should have requested a standard jury instruction from another jurisdiction in response to an unrelated question. The Court also notes that it did read the standard Pennsylvania jury instruction regarding circumstantial evidence. (TT 1289-91). Had the jury asked a question concerning circumstantial evidence, or the relationship between direct and circumstantial evidence, the Court certainly would have again read the jury instructions commonly used in this Commonwealth, or considered any instruction proposed by either the Commonwealth or defense counsel.

---

[1] The Bench Notes attached to that instruction also note that California trial courts have a *sua sponte* duty to instruct on how to evaluate circumstantial evidence if the prosecution substantially relies on circumstantial evidence to establish any element of the case. That Bench Note also cites to the two California Supreme Court cases (*Bloyd* and *Heishman*) that are also cited by Defendant.

As Defendant's claim cannot pass the first prong of the ineffectiveness test described, *supra*, his argument is without merit, and must fail. The Court has already determined that the claims initially introduced in Defendant's *pro-se* petition, and adopted in the amended petition filed by Attorney Timothy Andrews, are also without merit.

THE DEFENDANT IS NOTIFIED THAT ANY APPEAL TO THE SUPERIOR COURT OF PENNSYLVANIA FROM THIS COURT'S DISMISSAL OF HIS PCRA PETITION MUST BE FILED WITHIN THIRTY (30) DAYS FROM THE DATE OF THIS ORDER OF COURT.

BY THE COURT:

Rita Donovan Hathaway, President Judge

ATTEST:

Clerk of Courts

cc:    File
John W. Peck, Esq., District Attorney
Chris Eyster, Esq., Counsel for Defendant
3242 Babcock Boulevard, Pittsburgh, PA 15237
Pamela Neiderhiser, Esq., Court Administrator's Office

6

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA )<br><br>VS. )<br><br>ERIC J. HALL, )<br><br>Defendant. ) | No. 6 C 2012 |

## OPINION OF THE COURT
## AND NOTICE OF INTENT TO DISMISS

AND NOW, this ___ day of February, 2017, upon consideration of Defendant's petition filed pursuant to the Post Conviction Relief Act, (42 Pa.C.S. §9541, *et seq.)* and upon consideration of the amended PCRA petition submitted by Timothy Andrews, Esq., court-appointed PCRA counsel for Defendant, as well as the testimony and briefs submitted in support of that petition, it appears to the Court that there may be no genuine issue of material fact, no entitlement to relief and no purpose to be served in further proceedings for the following reasons:

## I. FACTUAL AND PROCEDURAL HISTORY OF THE CASE

Eric J. Hall ("Defendant") was convicted on September 18, 2013 of two counts of Criminal Homicide and related charges after a jury trial. He was sentenced on December 17, 2013 to two consecutive life sentences. Defendant timely filed a Notice of Appeal to the Pennsylvania Superior Court on January 15, 2014. The Pennsylvania Superior Court

affirmed the Court's Judgment of Sentence on December 16, 2014. The Pennsylvania Supreme Court denied Defendant's Petition for Allowance of Appeal on May 12, 2015.

Defendant filed a timely *pro-se* PCRA petition on November 30, 2015. The Court appointed Attorney Timothy Andrews to represent Defendant. Attorney Andrews initially filed a No-Merit Letter on February 25, 2016. After *pro-se* correspondence sent to the Court by Defendant indicating certain alibi issues not addressed in the No-Merit Letter, the Court granted Attorney Andrews an extension to file an amended PCRA petition based on facts contained in the correspondence and upon further review with Defendant.

Attorney Andrews filed an amended PCRA petition on June 30, 2016. A hearing was held on November 15, 2016 to determine the merits of the petition.

FACTUAL HISTORY:

The evidence presented at trial established the following: Anthony ("Tony") Henderson and Noelle Richards were a young couple residing on Fox Road in Washington Township, Westmoreland County. The property was rural and not immediately accessible from SR 66, the nearest main road. On August 28, 2011, at approximately 8:00 p.m., Tony and Noelle drove to Dairy Queen in nearby Delmont to purchase food and an ice cream cake. (TT 422-37, 1024-25).[1] They left the restaurant and traveled back to their home at 8:08 p.m. (TT 1025).

At approximately 8:30 p.m., Michael DiVincenzo, Greg DiVincenzo and Sam Denillo traveled to Tony and Noelle's house to purchase marijuana from Tony. Michael

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the trial of this matter, held September 9-13 and 16-18, 2013 before this Court, and made a part of the record herein.

testified that Sam Denillo drove the three of them to Washington Township in his black Jeep. Michael testified that on a prior occasion the gate at the top of the lengthy driveway had been closed. On this trip, however, the gate was already open, and they proceeded directly down the driveway to the rear of the house. (TT 81-88, 178).

Michael DiVincenzo and Denillo approached the sliding glass doors near the back patio and knocked, but neither Tony nor Noelle answered the door. He noticed light emanating from a television but because the sliding glass door was covered by vertical shades, he could not determine whether anyone was inside. (TT 89-90). Michael continued to knock at the sliding glass door, and also checked around the perimeter of the house to try to locate Tony. He decided to call Paul Hoover, who also resided at the location, to see if he knew whether Tony was home. As he was speaking with Hoover, he noticed that someone was approaching the door from inside the home. (TT 90-92). The sliding glass door opened, and an unfamiliar man emerged brandishing a baseball bat.[2] He immediately swung the baseball bat and hit Sam Denillo on the side of his head. Denillo fell to the ground. The man then started toward Gregory DiVincenzo, swinging the bat at him as well. Gregory was able to block the blow with his arm. Michael told him that they would leave the residence, but the man chased after Michael, who ran to escape from him. The individual with the bat gave up the chase after a short time, and went back inside the house. Intending to flee the area, Michael and Gregory DiVincenzo managed to help Sam Denillo back into the vehicle. Michael realized that he had lost his cell phone. Gregory dialed Michael's number on his own phone in an attempt to locate it. Michael

---

[2] Michael DiVincenzo described the bat as being yellow and somewhat pinkish on the end.

11a

then noticed that the man had come back outside the house and was laying flat on his stomach as if he was searching for something. He stood up, and Michael could hear what sounded like his cell phone ringing from an area near the man's midsection. Michael asked the man to toss him his cell phone, and stated that they would leave thereafter, but the man stared at him blankly. (TT 92-100, 183-89).

The trio left the Henderson property, driving on Fox Road toward its intersection with SR 66, while Gregory DiVincenzo called 9-1-1 from the vehicle to summon medical help for Sam Denillo. The call was received by Westmoreland 9-1-1 at 8:44 p.m. (TT 1024). Denillo was groggy and bleeding from his mouth. While they were waiting for the police and an ambulance, a dark colored Jeep Grand Cherokee drove past them at a high rate of speed, made a left turn onto SR 66 without stopping at the stop sign, and drove toward Delmont. Believing it to be the same person who had assaulted them, Gregory DiVincenzo called 9-1-1 again and reported his observations about the vehicle. (TT 101-03, 190-93). The second call was received by Westmoreland 9-1-1 at 8:49 p.m. (TT 1024). Denillo was flown by medical helicopter to Allegheny General Hospital in Pittsburgh, where he was admitted for three days, underwent surgery for a broken jaw, and was treated for a concussion and bleeding in his ear. (TT 156-67).

Michael DiVincenzo later identified Defendant from a series of photos as the bat-wielding individual who attempted to assault him and his brother, and who assaulted Sam Denillo. Sam Denillo had little or no memory of the events. Gregory DiVincenzo was unable to positively identify Defendant's photograph from the series of photos shown to

him by the police, but he was able to make a positive identification at the preliminary hearing and at trial. (TT 110-12, 157-69, 193-95).

As the DiVincenzo brothers and Sam Denillo were waiting on the side of Fox Road for an ambulance, Corey Lutz and his friend Joe Giarusso, in separate vehicles, were turning from SR 66 onto Fox Road on their way to Anthony Henderson's house. Lutz noticed the three men in the Jeep parked at the intersection. (262-65, 275-76). When Lutz arrived at the Henderson home, he first noticed that the gate at the top of the driveway was not locked as it customarily was, and that it appeared to be damaged. When he reached the rear of the house, he noticed that the grill had been overturned in the driveway, furniture was out of place, there were broken items on the patio, and the sliding glass door was open. (TT 265-269).

Lutz entered into the house through the sliding glass door and discovered the bodies of Anthony Henderson and Noelle Richards in the finished basement living area. (TT 270-72, 284-86). Lutz indicated that he believed that Noelle might have been breathing slightly, but that she would not respond to him. He observed that she had blood on her head and was slumped over on the couch. He related that he saw Tony Henderson's body lying on the floor by the coffee table in front of the fireplace in a large pool of blood. (TT 270-74). The food from Dairy Queen was still on the coffee table, and Lutz recalled that he could smell "fresh food, like, a hamburger with a bite taken out of it, a thing of French fries that wasn't even dipped into the ketchup yet... I remember looking down and noticing that they didn't even get to eat." (TT 273). He immediately called 9-1-1; the police received the dispatch while they were assisting the DiVincenzos

13a

and Sam Denillo at the intersection of Fox Road and SR 66. (TT 106-07). Lutz's call was received by Westmoreland 9-1-1 at 8:56 p.m. (TT 1024).

Forensic Pathologist Dr. Cyril Wecht testified that Tony Henderson had sustained three gunshot wounds—two to his head and one to his forearm—and also had a multitude of wounds to his head that suggested he had been beaten with some sort of instrument with blunt force. (TT 611-25). Indeed, Dr. Wecht testified that the injuries suggested that he had received repeated blows, administered with substantial force, to the back of his head, consistent with the use of a baseball bat as the weapon. (TT 643-44). Dr. Wecht opined that these injuries would not have necessarily been fatal had Tony Henderson received prompt medical intervention and neurological treatment. (TT 629-30). Dr. Wecht explained that the cause of death would have been "the multiplicity of all injuries producing an adverse effect . . . the two gunshot wounds of the head would have been the major injuries contributed to by the multiple lacerations leading to loss of blood and thereby hastening the development of shock and death." (TT 631).

Dr. Wecht also performed an autopsy on the body of Noelle Richards. Dr. Wecht explained that she had also sustained three gunshot wounds, all to her head, as well as a laceration around her right ear that was caused by blunt force instrumentality. (TT 633-40). He opined that Noelle would have died within thirty minutes of sustaining the fatal gunshot wounds to the head. (TT 640). Dr. Wecht testified that Noelle Richards' cause of death was "the three gunshot wounds of the head and face with some contribution from the laceration caused by a blunt force instrument of some kind in the right temporal

14a

6

region. All of those producing that trans-sellar fracture would have been the cause of her death." (TT 640-41).

During the initial investigation into the deaths of Anthony Henderson and Noelle Richards, law enforcement had no suspects, as neither DiVincenzo brother nor Sam Denillo knew the identity of the bat-wielding man who attacked them. However, on August 29, 2011, Anna Stouffer found a black tri-fold wallet on the ground to the rear of her van, which was parked on the street outside her residence at 221 Church Street in Ligonier Borough. She knew that the vehicle parked there the night before was associated with the residents of 217 Church Street. (TT 656-59, 671). Ms. Stouffer looked inside the wallet in an attempt to identify the owner, and saw that the license belonged to Anthony James Henderson. She then took the wallet to the Ligonier Borough Police Department at 2:25 p.m. (TT 659-67).

Jeremy Springer, who worked with Defendant and his brother, Jay, testified that on August 28, 2011, Defendant had assisted him in removing a roof at his residence. Defendant arrived at approximately 7:00 a.m. in a green Jeep, and his brother arrived separately. As they worked on Springer's roof, Defendant kept receiving text messages on his cell phone. When asked who was contacting him, he stated it was his "guy from Delmont." (TT 957). Springer recalled that after Defendant had left for the day, he texted Defendant around 7:00 p.m. to thank him for helping with the roof. He noted that he did not receive a prompt response as usual, and did not receive another text from Defendant until approximately 9:45 p.m. (TT 955-59).

Springer also related that the next day, on August 29, 2011, Hall reported for work as usual. Over the lunch break, when Springer and Defendant were eating, Defendant began telling Springer what had happened to him the night prior, and stated, "You won't believe what happened to me last night." (TT 962). Defendant proceeded to tell Springer that he had gone to see his friend in Delmont, and that when he arrived, there were two dead people in the house. He said that he had gone to the back door when he did not receive a response to his knocking at the front door. He then walked into the back door and saw Tony on the floor with what he thought was a gunshot wound, and Tony's girlfriend lying on the couch with dried blood on the side of her face.

Defendant told Springer that he was afraid that the intruder was still in the vicinity, so he locked the back door. He then stated that he heard a car drive up, was afraid, and decided to hide inside the home. He told Springer that he heard Tony's phone ringing, and as he was hiding, happened upon a baseball bat that was lying on the ground. He stated that he picked up the bat, unlocked the door, and greeted the men he saw at the back door. Defendant told Springer that he thought he could get away, so he came out swinging the bat and thought he hit the bigger man in the head. He related that the men scattered, and he grabbed what one of them dropped and ran back inside the house. Defendant told Springer that he also grabbed Tony's phone and wallet. (TT 962-69).

Defendant told Springer that he left the house and drove toward Ligonier. He stated that on his way, he stopped at Donegal Lake, removed the batteries from the two cell phones that he had taken from the house, and threw them into the lake. He did this, he said, because he had seen on television that if the battery was removed from a phone,

168

the phone could not be traced. He also informed Springer that he had removed all of his clothing, including his shoes, had thrown them and the wallet into a garbage bag, and discarded them at a dumpster behind a methadone clinic. He also related that he stopped at Walmart on the way home to buy Clorox and wiped his Jeep down in case there were any blood traces from his shoes or the clothing he had been wearing. He stated that he still had the bat, but days later told Springer that he had thrown it into the woods. Springer urged Defendant to speak with law enforcement, but Defendant stated that he wanted to wait to do that. (TT 969-78). Jeremy Springer testified that, after consulting with his attorney and telling her what Defendant had revealed to him, he contacted the County Detectives Bureau and told them about Defendant's story.

Law enforcement verified that Defendant had visited the methadone clinic on Monday, August 29, 2011 at approximately 5:43 a.m. (TT 1002-03). The Commonwealth also presented video footage from the Latrobe Walmart, showing that Defendant visited that store at approximately 6:24 a.m., purchased cleaning materials, and extensively cleaned his car in the parking lot. (TT 895-910). The bottle of Soft Scrub cleanser that Defendant purchased was recovered in a search of the Jeep Cherokee that was driven by Defendant on the night of August 28, 2011. (TT 682-84). Also recovered from the Jeep were numerous blood samples, which were later matched through DNA analysis to Sam Denillo and Anthony Henderson. (TT 733-41). Analysis of text messages on Defendant's phone indicated that he had borrowed a 9mm Taurus firearm from his mother and had discarded it after the murders. (TT 1018-20). Analysis of the bullet

casings and fragments recovered at the scene of the murder indicated that the ammunition used was 9mm ammunition, likely used in a 9mm automatic firearm. (TT 800-01).

Defendant maintained that he had gone to Anthony Henderson's home to purchase drugs, and that when he arrived at Tony's driveway, he was nearly run off the driveway by a large dark SUV/truck coming in the opposite direction. (TT 1100-01). When he approached the back door, he noted that the dog was sniffing at something in the driveway. He saw it was a wallet, and picked it up. He also picked up a cell phone that was on the ground. He noted that the patio area was in disarray. (TT 1103-06). He averred that he then entered the house and discovered the bodies of Noelle Richards and Tony Henderson. He observed that a vehicle had arrived at the house, and "guys started pouring out of it." (TT 1113). He locked the back door, thinking that the people who had murdered Tony and Noelle had come back for him. He found a baseball bat at the end of the couch and decided to attack these individuals. He swung the bat at these individuals, hitting two of them. When he had chased them away, he searched the ground for a gun, and picked up something hard.

He went back inside the house until these men left, and then departed, taking the cell phone, wallet, and bat with him. (TT 1113-20). He testified that he gave no thought whatsoever to calling the police. (TT 1120). He testified that he drove back to Ligonier, and when he was on SR 30, he threw the bat and the cell phones out the window. (TT 1123-24). When he arrived home, he took a shower and discarded his clothing in a trash can that had been placed by the curb to be picked up in the morning. Defendant testified that he woke early the next morning for work, went to the methadone clinic in

Greensburg, and then stopped at Walmart in Latrobe so he could clean up the Jeep. Defendant stated that he had thrown up in the Jeep the night before, and needed to clean the vehicle before picking his brother up for work. (TT 1123-30). Defendant also admitted that he had thrown away the 9mm Taurus handgun that he had borrowed from his mother so that the police would not find it. (TT 1135-38, 1204-12).

## ELIGIBILITY FOR RELIEF:

The requirements for eligibility for relief under the Post-Conviction Relief Act are set forth both in the Act itself (42 Pa.C.S. §9541, *et. seq.*) and in the Rules of Criminal Procedure (Pa.R.Crim.P. Rules 901 and 902). Generally speaking,

> PCRA petitioners, to be eligible for relief, must, inter alia, plead and prove their assertions by a preponderance of the evidence. Section 9543(a). Inherent in this pleading and proof requirement is that the petitioner must not only state what his issues are, but also he must demonstrate in his pleadings and briefs how the issues will be proved. Moreover, allegations of constitutional violation or of ineffectiveness of counsel must be discussed "in the circumstances of the case." Section 9543(a)(2)(i-ii). Additionally, the petitioner must establish by a preponderance of evidence that because of the alleged constitutional violation or ineffectiveness, "no reliable adjudication of guilt or innocence could have taken place." Section 9543(a)(2)(i-ii). Finally, petitioner must plead and prove that the issue has not been waived or finally litigated, §9543(a)(3), and if the issue has not been litigated earlier, the petitioner must plead and prove that the failure to litigate "could not have been the result of any rational, strategic or tactical decision by counsel." Section 9543(a)(4).
> *Comm. v. Rivers,* 786 A.2d 923, 927 (Pa. 2001).

Additionally, because Defendant has raised an allegation of ineffective assistance of counsel, he must plead and prove, by a preponderance of the evidence:

> (1) that there is merit to the underlying claim; (2) that counsel had no reasonable basis for his or her course of conduct; and (3) that there is

> a reasonable probability that, but for the act or omission challenged, the outcome of the proceeding would have been different. *Comm. v. Jones*, 683 A.2d 1181, 1188 (Pa. 1996). Counsel is presumed to be effective and Appellant has the burden of proving otherwise. *Comm. v. Marshall*, 633 A.2d 1100 (Pa. 1993). Additionally, counsel cannot be considered ineffective for failing to raise a claim that is without merit. *Comm. v. Peterkin*, 649 A.2d 121 (Pa. 1994).
> *Id., citing Comm.v. Holloway*, 739 A.2d 1039, 1044 (Pa. 1999).

Defendant's sole contention is that trial counsel, Michael Dematt, Esq., was ineffective for failing to call Defendant's mother, Deborah Finley, as a witness. Defendant avers that had she been called to testify, she would have stated that she loaned her son the gun—identified as the murder weapon at trial—at least two days after the murders occurred. Defendant initially presented two other arguments in his petition, but formally withdrew them at the evidentiary hearing. (PT 29).[3]

1.  WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO CALL DEBORAH FINLEY AS A WITNESS?

When raising a failure to call a potential witness claim, the PCRA petitioner satisfies the reasonable basis and prejudice requirements of the ineffectiveness of counsel test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Comm. v. Washington*, 927 A.2d 586, 599 (Pa. 2007). To demonstrate prejudice, Defendant "must show how the uncalled witnesses' testimony would have been beneficial

---

[3] Numerals in parenthesis preceded by the letters "PT" refer to specific pages of the transcript of the PCRA hearing in this matter, held November 15, 2016 before this Court, and made a part of the record herein.

under the circumstances of the case." *Comm. v. Gibson*, 951 A.2d 1110, 1134 (Pa. 2008); *see also Comm. v. Chmiel*, 889 A.2d 501, 546 (Pa. 2005).

Trial counsel will not be found ineffective for failing to investigate or call a witness unless there is some showing by Defendant that the witness's testimony would have been helpful to the defense. *Comm. v. Brown*, 767 A.2d 576, 582 (Pa.Super. 2001); *see also Comm. v. Sneed*, 45 A.3d 1096, 1108-09 (Pa.Super. 2013). Failure to call a certain witness "is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy." *Sneed*, 45 A.3d at 1108-09. Thus, it is Defendant's burden to demonstrate that trial counsel had no reasonable basis for declining to call Finley as a witness. *Comm. v. Washington*, 927 A.2d 586, 599 (Pa. 2007).

Evidence presented at trial established that the Taurus 9mm handgun was loaned to Defendant by his mother, Deborah Finley. Larry Lipton, records manager at Gander Mountain, testified that on September 2, 2009, Charles Finley (Defendant's stepfather) purchased a Taurus PT709 Slim at their Greensburg store. (TT 863-64). Charles Finley died on June 30, 2011. (TT 882).

The Commonwealth introduced text messages between Defendant and his mother concerning the handgun. On September 3, 2011, Deborah Finley sent a text message to Defendant reading, "I need my gun back. I found case for it." (TT 1202). Defendant replied on September 7, 2011, "Next time I go to Greensburg I'll get your gun out of Carly's dad's safe for ya. We put it there before the move so it wouldn't get lost." (TT 1202).

Further, on September 13, 2011, the following text message exchanged occurred

between Defendant and his mother:

> Finley: Where was my gun from time you first took it.
> Finley: Why won't you answer me. Who had my gun in their hands besides you.
> Defendant: Mom, I have to wait now before I tell anyone anything. I have nothing to hide, but everything can be used against me now.
> Finley: You let someone borrow my gun didn't you.
> Defendant: Your gun did not do anything.
> Finley: Okay.
> Defendant: It's just a coincidence, and they want to clear it for sure.
> Finley: Okay.
> Defendant: I had more to tell you that day, but after you contacted [Officer] Amber [Noel] I knew I couldn't tell you anything else . . . For our safety.
> Finley: Because my loved ones and dear friends are being drug into this dammit so if you know something spill it and end it.
> Defendant: They shouldn't have been in the first place.
> Finley: Well, they are all now because you did a dumb thing by throwing my gun away so don't blame me. I trusted you to be responsible with it and I was not getting in trouble for my gun being out in some field to be used in a crime or to hurt someone.
> Defendant: Well, I have the police breathing down my beck, probably trying to give me the death penalty if they get a chance because I'm the next best thing.
> Defendant: The police aren't my friends. I don't trust them.
> (TT 1018-20).

Defendant testified at trial that he borrowed the gun from his mother after the

murders. He stated:

> Defendant: [A]fter the incident, after the night of the murders, the next day I was really paranoid about being able – those guys being able to find me so I went and bought locks for my house. I probably put three or four padlocks on my front door and another two or three padlocks on my back

> door. I was still not comfortable with the security of the apartment. At night I would leave things in the hallway so I could hear somebody falling over in case they tried to do something. I wasn't sleeping too well. I went to my mom's. My grandmother was over there. I'm pretty sure it was the Tuesday after --
>
> **Attorney DeMatt**: So within a day or so . . .
>
> **Defendant**: . . . of September 1st.
>
> (TT 1134).

He further testified that approximately one week after September 1, Westmoreland County Detectives executed a search warrant on his residence. (TT 1135). He stated that the handgun was in his residence at that time, "in a case under a vent." (TT 1135). He testified:

> **Defendant**: There was a vent cover and it was sitting underneath that in the dining room. I was on probation. There was alcohol in the refrigerator and I thought I'm going to jail until I help them or do something because Detective Weaver sat down with me and I told him that I wanted a lawyer so he asked me if I could please help him in any way . . . (TT 1135-36).

He stated that detectives did not locate the handgun during their search. (TT 1136). He stated that as soon as they left, he retrieved the gun, put it in a plastic bag, and placed it in the neighbor's garbage can. (TT 1137). He noted that the garbage was to be picked up the next morning. (TT 1137). He relayed that he meant to retrieve the handgun from the garbage can in the morning, but that the garbage had already been picked up. (TT 1137).

At the evidentiary hearing for the instant PCRA petition, Finley testified that she loaned her son the handgun on August 30, 2011. She testified that several months after the crime, she checked her desk calendar to determine whether she had noted the date in question on the calendar. She stated:

> Finley: Sometime later I had gone to work and every month we keep a calendar, a desk calendar on our desks, a blotter, and I always would write things down so I didn't forget about it. By chance I thought to look at them. We kept them in a cabinet in our office, and I pulled out the calendar for that year and looked back to the date and I had written it down. (PT 6).

The desk calendar was introduced into evidence. Attorney Andrews then inquired as to

why it occurred to Finley to reference the calendars:

> Attorney Andrews: And you indicated I believe previously that something on that calendar refreshed your memory or made you remember the day in which you loaned the weapon that you discussed, the Taurus, to your son. What on that calendar refreshed your memory of that?
>
> Finley: The date. I was at home thinking about it and I thought – I remembered the date of the murders . . . I thought to go to work and to look – by chance look at this calendar to see if I might have written something down.
>
> Attorney Andrews: And did you write anything down on the 30th?
>
> Finley: Yes, I did . . . I have on there what was going on for the day at my job, but I had also wrote down that [Defendant] borrowed the gun from me that day.
>
> Attorney Andrews: Did you write anything on the 28th, the date the murders took place?
>
> Finley: Yes, I marked that day when I found out about the murders.
>
> Attorney Andrews: Now, obviously, ma'am, there is nothing on there to indicate whether you wrote that down on August 30, 2011, or whether you wrote that down five months later, ten months later, or yesterday, right?
>
> Finley: No.
>
> Attorney Andrews: But it's your testimony that you wrote that down on August 30, 2011 just to mark the date that you loaned your son this weapon?
>
> Finley: Yes
> (PT 8-10).

She also testified that she never informed Attorney DeMatt of her discovery. She did state that she informed Defendant prior to trial that she would be available as a witness to testify about the date she loaned him the handgun. (PT 10). Under cross-examination by District Attorney John Peck, she stated her reasons for not specifically informing Attorney Dematt about her knowledge of the date in question. Peck inquired:

> **District Attorney:** So why didn't you tell Mr. DeMatt, since you knew that the Commonwealth was trying to establish the murder was committed with a 9mm weapon, that your son had a 9mm weapon and that the implication would be that he has killed them with that gun that you had given him, that you didn't give him the gun because you had it until August 30th?
> **Finley:** I didn't tell him because I assumed that [Defendant] had updated him and told him about it.
> **District Attorney:** Did [Defendant] know about this calendar that you kept?
> **Finley:** No, he did not.
> (PT 19).

Peck also inquired as to why Finley had written down the date of the murders on her desk calendar:

> **District Attorney:** My question is, for some reason you also write the word murders on August 28?
> **Finley:** Yes.
> **District Attorney:** You didn't know who the victims were, did you?
> **Finley:** No.
> **District Attorney:** But somehow you related the gun to the murders?
> **Finley:** No.
> **District Attorney:** Well, why did you write on the same date murders and [Defendant] borrowed the gun –
> **Finley:** I don't know.
> **District Attorney:** If you didn't think they were related?
> **Finley:** I don't know.
> (PT 23).

Peck noted that Finley had been interviewed by Detectives Terrance Kuhns and Robert Weaver soon after the crime. Finley informed them that her husband died on June 30, 2011, and that she had loaned her son the Taurus 9mm handgun approximately one month later. (PT 24). Finley denied making the statement. (PT 24). Peck also asked whether she recalled the date that she told Officer Amber Noel she loaned Defendant the handgun; she stated that she did not recall. (PT 25). Officer Noel's report stated that Finley provided Defendant with the handgun approximately two weeks before September 8, 2011, a date prior to the murders. (PT 46-47).

Finley then testified that she had discovered the desk calendar in March 2012, more than one year before the trial. (PT 19-20). When asked again by District Attorney Peck why she did not bring the evidence forward to Attorney DeMatt, she stated: "I didn't believe at trial it was stated that weapon could have, you know, done anything." (PT 20).

Defendant testified at the evidentiary hearing that he had borrowed the Taurus 9mm handgun from his mother on August 30, 2011. (PT 28). He stated that he informed trial counsel that his mother would be available to testify that she had loaned him the handgun on that date. (PT 28).

Attorney DeMatt testified that while Defendant told him that he had not received the handgun from his mother until after the crime occurred, he was unsure if Defendant specifically identified his mother as a potential witness to bolster his claim. (PT 43). DeMatt, testified, however, that:

Attorney DeMatt: I know I had several conversations with Ms. Finley during my representation of [Defendant] about a number of different issues and my recollection of what was contained in discovery was that she had indicated to the police, in particular I believe it was Amber Noel, that she had given the gun to [Defendant] at some time prior to the homicide so I didn't feel that it would – she would have been a good witness to call so I never really even approached that – approached her regarding testifying at trial.

Attorney Andrews: So then, based upon your review of the police reports of Officer Noel, you were concerned and determined not to call Ms. Finley as a witness for fear that the testimony of the officer regarding her statements about when her son got the handgun would be discredited?

Attorney DeMatt: My concern was that it would blow up in our face, because as his mother she was obviously a biased witness. And then to have police reports that would be contradicting what she says before a jury, which you can very easily be cross-examined on and impeached on, I had grave concerns about that so I saw no reason to call her as a witness.

Attorney Andrews: And were you aware at all about this calendar that she kept and made notes on?

Attorney DeMatt: The first time I ever heard anything about it was this morning when she mentioned it.

(PT 44-45).

Although the testimony presented at the evidentiary hearing established that Finley was an available witness, that she would have testified for the defense, and that defense counsel may have known of her existence regarding her testimony (excluding the desk calendar), the absence of her testimony was not prejudicial to Defendant. Indeed, Attorney DeMatt noted his reasons for not calling Deborah Finley as a witness. Because of discovery tending to prove that Finley had informed officers that she had loaned Defendant the handgun months or weeks before the murders, and the fact that she would

appear to be a biased witness, DeMatt was concerned that such testimony would "blow up in our face." (PT 45).

This Court further finds that Attorney DeMatt's testimony was highly credible. As he noted, Finley could easily have been impeached with her statements to officers, and Attorney DeMatt determined that based on these inconsistent statements, her testimony would not be in his client's best interest. Defense counsel's decision represents a trial strategy as outlined in cases such as *Comm. v. Sneed*, 45 A.3d 1096, 1108-09 (Pa.Super. 2013). DeMatt noted that he met with Finley in person approximately three to five times, and spoke with her on the telephone approximately a dozen times. (PT 45-46). While he was unsure if Finley unequivocally stated that she had loaned her son the handgun before the murders, he testified that Defendant informed him of this fact. (PT 46). Finley also testified that she never informed DeMatt about the existence of the desk calendar, and DeMatt confirmed that fact in his own testimony. (PT 19, 45). Thus, DeMatt made a conscious decision, based on the information available to him, that Finley would not be a reliable witness.

Conversely, this Court finds that Deborah Finley was not a credible witness. It finds troublesome the fact that Finley wrote "murders" on her calendar two days before her entry that states that she loaned Defendant the handgun. At the time, she did not know the victims of the crime, nor was she aware that any connection existed between the two events. When District Attorney Peck inquired as to when Finley wrote "murders," she stated: "I think I wrote it at the same time that I wrote that the gun – about the gun so I could remember." (PT 22). Finley also denied informing officers that she loaned her son

the handgun prior to the murders, although her statements were contained in police reports. (PT 24). Finley testified that while she was present for every day of the trial, she did not recall hearing certain evidence linking her son to the Taurus 9mm, and did not feel that her testimony regarding the existence of the desk calendar would be helpful to Defendant at trial. (PT 17, 20).

Defendant, then, has not met his burden in establishing that there was no reasonable basis for failing to call Finley as a witness. Finley's incongruous statements to officers and the Court do not reflect that her testimony would have been beneficial for Defendant, and Attorney DeMatt had a reasonable basis for not producing her as a witness at trial. Based on the testimony and claims discussed, *supra*, Attorney DeMatt was not ineffective as a result of this determination, and Defendant's claim must fail.

## NOTICE OF INTENT TO DISMISS:

Accordingly, the Court hereby notifies the parties of its intention to dismiss Defendant's amended post-conviction petition.

THE DEFENDANT MAY FILE A WRITTEN RESPONSE TO THIS NOTICE. SUCH A RESPONSE MUST BE FILED WITHIN 20 DAYS FROM THE DATE OF THIS NOTICE. IF NO RESPONSE IS FILED, THIS COURT SHALL DISMISS THE PETITION.

If a response is filed, this Court may, instead, upon consideration of the response, grant leave to file an amended petition or otherwise direct that the proceedings continue. Any response should address specifically the areas of defect delineated within the body of this Order of Court.

If no response is filed, the Court shall dismiss the Defendant's PCRA Petition. If a response is filed, the Court may, upon consideration of the response, dismiss the Petition, grant leave to file an amended Petition or otherwise direct that the proceedings continue.

Defendant may, if he chooses, avail himself of the assistance of PCRA counsel in the preparation of this response, or he may elect to file the required response *pro-se*.

_____ , J.
Rita Donovan Hathaway, Judge